IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

KEVIN M.,[1]

      Plaintiff,

v.                                        Case No.: 3:22-cv-00368

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,

      Defendant.

PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of the Complaint and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 8, 9).

---

[1] The Court lists only the first name and last initial of any non-government parties in Social Security opinions pursuant to the October 31, 2022 Standing Order in this District, which adopts the recommendation of the May 2018 Judicial Conference Committee on Court Administration and Case Management concerning privacy of personal and medical information.

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

In September 2019, Kevin M. ("Claimant") protectively filed for DIB and SSI, alleging a disability onset date of December 31, 2017 due to "tremors, social anxiety, depression, bipolar, childhood ADHD, and vision issues." (Tr. at 196-212, 249). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 18). Claimant then filed a request for an administrative hearing, which was held on November 5, 2021 before the Honorable Anthony J. Johnson, Jr., Administrative Law Judge ("the ALJ"). (Tr. at 34-73). By written decision dated December 23, 2021, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 15-33). The ALJ's decision became the final decision of the Commissioner on August 1, 2022 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 6, 7). Claimant filed a Brief in Support of the Complaint, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 8, 9). The time period for Claimant to file a reply to the Commissioner's brief expired. Therefore, the matter is ripe for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 42 years old on his alleged disability onset date and 46 years old on the date of the ALJ's decision. (Tr. at 28). He communicates in English; earned an associate's degree in business, as well as a welding certificate; and previously worked as a welder and welding instructor. (Tr. at 65, 248, 250, 308).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c).

Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for DIB through June 30, 2023. (Tr. at 21, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 31, 2017, the alleged disability onset date. (*Id.*, Finding

No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: essential tremors, depression, and anxiety. (*Id*., Finding No. 3). The ALJ also considered Claimant's alleged bipolar disorder, childhood ADHD, vision issues, and Parkinson's Disease, but he determined that they were not medically determinable impairments. (Tr. at 21).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 21-23, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: he can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, stand and/or walk six hours in an eight-hour workday, and sit six or more hours in an eight-hour workday. He can occasionally climb ramps or stairs, never climb ladders, ropes or scaffolds. He can occasionally balance, stoop, kneel, crouch, or crawl. He can handle and/or finger occasionally with his left upper extremity and frequently with his right upper extremity. He can frequently, but not constantly, feel with his bilateral upper extremities. He can perform non-production pace/non-assembly line pace jobs with occasional workplace changes introduced gradually over time, occasional independent decision-making, and no responsibility for the safety of others. He is able to interact with the general public, coworkers, and supervisors occasionally.

(Tr. at 23-27, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform his past relevant work. (Tr. at 27, Finding No. 6). Therefore, the ALJ reviewed Claimant's prior work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (Tr. at 28-29, Findings 7 through 10). The ALJ considered that (1) Claimant was born in 1975 and was defined as a younger individual on the alleged disability onset date; (2) Claimant had at least a high school

6

education; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 28, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as an optical lens matcher or sorter. (Tr. at 28-29, Finding No. 10). Thus, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 29, Finding No. 11).

## IV.   <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the ALJ (1) failed to develop the evidence concerning his impairments and (2) did not properly construct or explain the RFC finding. (ECF No. 8). In response, the Commissioner contends that the medical record was sufficiently developed, and the ALJ properly assessed Plaintiff's RFC and supported his findings with substantial evidence. (ECF No. 9 at 7-12). The Commissioner notes that Claimant does not identify any gaps in the record or evidence that should have been requested. (*Id.* at 9). Further, the Commissioner asserts that Claimant does not specifically identify any ways in which the RFC analysis or the resultant findings were deficient. (*Id.* at 12).

## V.   <u>Relevant Evidence</u>

The undersigned reviewed all of the evidence before the Court. The following information is most pertinent to Claimant's challenges.

### A.  *Treatment Records*

On November 10, 2017, Claimant presented to his primary care provider, Todd W. Lester, PA-C, for a wellness examination. (Tr. at 333). Claimant expressed that he was doing well "for the most part," but he was experiencing some upper extremity tremors.

7

(*Id*.). PA-C Lester stated that there seemed to be "no rhyme or reason" for the tremors. (*Id*.). The tremors were sometimes worse than other times, and they were precipitated by increased stress. (*Id*.). PA-C Lester noted that Claimant's past medical history was "pretty unremarkable." (*Id*.). Claimant did not display any tremors on examination; he maintained full range of motion; his fine and gross movements were intact; and his grip strength was 4/5 bilaterally. (*Id*.). PA-C Lester diagnosed Claimant with "essential tremor most likely with workup ongoing." (Tr. at 335). He planned to follow up with blood work and a possible EMG. (*Id*.).

However, Claimant did not follow up with PA-C Lester for two years. (Tr. at 330). On November 21, 2019, Claimant presented to PA-C Lester, complaining of increased tremors. (*Id*.). He noted that he had a strong family history of Parkinson's Disease and worked as a welder. (*Id*.). Claimant stated that the tremors were becoming so significant in his upper extremities that he was dropping things, particularly with his left hand. (*Id*.). Claimant expressed that he and his wife were very concerned about his symptoms. (*Id*.). He reported that he was occasionally unable to use his left upper extremity and felt "vibration throughout his body." (*Id*.). Stress and fatigue seemed to precipitate the symptoms. (*Id*.). On examination, PA-C Lester observed diffuse upper extremity tremors, but Claimant's range of motion and fine and gross movement remained intact, and his grip strength was 4/5 bilaterally. (*Id*.). PA-C Lester again diagnosed Claimant with likely essential tremor, ordered testing, and referred Claimant to a neurologist, Ronald E. Barebo, M.D. (Tr. at 332).

During Claimant's next wellness examination on December 9, 2019, PA-C Lester documented that Claimant's laboratory results did not reflect any abnormalities to explain the tremors and feeling of vibration. (Tr. at 327). Claimant's examination results

8

remained the same as his previous visit. (*Id*.). PA-C Lester noted that Claimant had an upcoming EMG Nerve Conduction Study and appointment with Dr. Barebo, but he had no other medical issues or complaints. (*Id*.). The EMG and nerve conduction study on December 10, 2019 showed mild right carpal tunnel syndrome, and no abnormalities in Claimant's left upper extremity. (Tr. at 326).

On February 11, 2020, Claimant presented as a new patient to Dr. Barebo. Claimant reported that he worked as a welder and had a history of tremors since he was five years old. (Tr. at 323). The tremors reportedly worsened progressively over the last few years, occurred with activities, and were starting to interfere with his activities of daily living. (*Id*.). Claimant stated that his left hand tremor was worse than his right, and he occasionally noticed a tremor in his voice. (*Id*.). He again claimed that stress and lack of sleep exacerbated the tremors. (*Id*.). On examination, Claimant displayed intention tremors bilaterally on finger-to-nose testing and Luria figures. (*Id*.). The other neurological findings were normal. (*Id*.). Dr. Barebo diagnosed Claimant with essential tremors and prescribed Corgard. (Tr. at 324-25).

Claimant followed up with Dr. Barebo on April 21, 2020, reporting that Corgard had been "remarkable" in helping with his symptoms. (Tr. at 321). Previously, his left hand always shook when he tried to hold things, but he could now use it without even "thinking about it." (*Id*.). His work as a welder was "very much improved with the medication." (*Id*.). Examination findings confirmed that Claimant's intention tremors were significantly improved. (*Id*.). He showed only a very mild tremor in his upper left extremity on finger-to-nose testing. (*Id*.). Claimant's muscle tone and strength, gait and station, and voice were normal; he demonstrated no cogwheeling; and his cranial nerves were intact. (*Id*.). Claimant's diagnosis and treatment remained unchanged. (*Id*.).

9

Claimant continued to improve on Corgard, reporting during his next appointment with Dr. Barebo on October 20, 2020 that he did not experience any significant tremors or side effects from the medication. (Tr. at 357). On examination, Claimant demonstrated very mild hand tremors and very mild, "almost physiological," tremors of the extremities. (*Id*.). Dr. Barebo did not make any changes to Claimant's diagnosis or medication. (*Id*.).

Almost one year later, on September 9, 2021, Claimant advised Dr. Barebo that he continued to do well on Corgard, but he suffered from an increase in symptoms over the past few weeks to months. (Tr. at 349). Claimant alleged increased tremors and weakness in his left upper extremity. (*Id*.). He also reportedly fell at times, including one time falling, hitting his head, and losing consciousness. (*Id*.). Claimant said that he had no warning before that incident and did not go to the hospital afterward. (*Id*.). Claimant steadied himself by holding on to "things." (*Id*.). On examination, Claimant had increased tremors in his upper extremities, particularly the left side; mild dysmetria and giveaway weakness in his left upper extremity; and mild postural instability. (*Id*.). Dr. Barebo diagnosed Claimant with essential tremors, including worsening tremors in the left upper extremity; recurrent falls with gait ataxia and closed head injury; episode of syncope with fall; and left upper extremity weakness. (*Id*.). He ordered a brain MRI, but did not change Claimant's treatment plan. (*Id*.).

The MRI of Claimant's brain on September 30, 2021 showed mild nonspecific white matter disease. (Tr. at 351). A repeat brain MRI on November 17, 2021 indicated numerous supratentorial white matter lesions which fit within the clinical history of demyelinating disease. (Tr. at 373). There was no change from the September 2021 brain MRI, and no evidence of active demyelination. (*Id*.). A cervical spine MRI taken the same day showed degenerative disc disease most significant at C6-C7, but no evidence of

demyelinating disease. (Tr. at 371).

### B. Evaluations, Opinions, and Prior Administrative Findings

On January 2, 2020, psychologist Tara Bias, M.A., performed a consultative Adult Mental Status Examination of Claimant. He reported a diagnosis of ADHD as a minor and was treated at Prestera Center ten years earlier, but Claimant was not receiving any current mental health treatment and had never been hospitalized for mental health reasons. (Tr. at 307). He noted that he participated in special education classes in school, but graduated from high school with above average grades, was never retained, completed an associate's degree in business, and obtained a welding certificate. (Tr. at 308). Based on Claimant's records and presentation during the examination, Ms. Bias diagnosed him with posttraumatic stress disorder, major depressive disorder, and opioid use in sustained remission. (Tr. at 309). Ms. Bias also noted that Claimant had unspecified ADHD by history. (*Id.*).

On February 28, 2020, state agency psychologist Joan Joynson, Ph.D, assessed Claimant, based on her review of his records, and opined that he was mildly limited in understanding, remembering, or applying information and moderately limited in interacting with others; maintaining concentration, persistence, or pace; and adapting or managing himself. (Tr. at 79-80, 92-93). She concluded that Claimant could perform two to three-step work functions and instructions, and he was best suited for a work setting with low public contact. (Tr. at 83, 96). Dr. Joynson's findings were affirmed by Jeff Harlow, Ph.D., on October 23, 2020. (Tr. at 109, 113, 121, 125). The state agency reviewing physicians, Narendra Parikshak, M.D., and Larry Curnette, M.D., concluded on May 19 and October 27, 2020, respectively, that Claimant had no significant physical functional limitations. (Tr. at 81, 94, 110, 122).

On October 13, 2021, Lukasz Rostocki, M.D., completed a Physician's Certification for Qualified Patients form under the West Virginia Medical Cannabis Act, W. Va. Code § 16A-1-1, *et seq*. The check-box form listed the serious medical conditions that qualified under the Act. (Tr. at 364). Dr. Rostocki checked the box marked Parkinson's Disease. (*Id.*). Dr. Rostocki initialed that he met with and examined Claimant on the date that he signed the form, expected to treat Claimant for Parkinson's Disease for the foreseeable future, established a medical record for Claimant, reviewed Claimant's medical records from other treating physicians for the past 12 months, and made or confirmed a diagnosis of Parkinson's Disease. (Tr. at 365).

### C. *Claimant's Statements*

Claimant testified during his administrative hearing on November 5, 2021 that he wished to represent himself. (Tr. at 39-40). He advised the ALJ about additional medical records that were not yet in evidence, including (1) additional records from Dr. Barebo and (2) an upcoming MRI on November 17, 2021. (Tr. at 39-41). The ALJ agreed to hold the record open for 21 days and work on obtaining the additional records using Claimant's medical authorization. (Tr. at 40-41, 71-72). As to work history and alleged disability, Claimant testified that he previously worked as a welder, and he was very passionate about that career. (Tr. at 43). He attempted to continue working in the field after his alleged onset date as an instructor. (Tr. at 43-44). Claimant stated that, near the end of 2017, he was unable to continue working as a welder when his symptoms began in his left hand. (Tr. at 45). He could not "hold on to things," and he started noticing his "arm kicking left to right," his shoulders moving, and his "skin crawling." (Tr. at 45). He presented to Dr. Barebo for testing. (*Id.*). Dr. Barebo prescribed a beta blocker, Corgard, which was initially effective, but it did not work as well after a while. (Tr. at 46).

Claimant described new symptoms which had appeared in the past month or so before the hearing. (Tr. at 48). His breath was sometimes fluttered, he felt tired, and he became dizzy doing anything more than 10 to 15 minutes, which required him to stop and focus. (Tr. at 48). Claimant reported that anytime that he stood up, it took him five to 10 seconds to get his bearings to walk. (*Id*.). Claimant stated that none of his symptoms were as "amplified" until approximately the last month. (*Id*.). Currently, he "pretty much" could not be left alone without falling. (*Id*.). He suffered multiple recent falls, including one during which he hit his head and lost consciousness. (Tr. at 49). In addition, he stopped driving three weeks before the hearing because his left hand jerked the car that he was driving into another lane, and he became dizzy. (Tr. at 50).

According to Claimant, although his left hand was most problematic in terms of tremors, he lacked strength in his dominant right hand and could not write without pain and cramping. (Tr. at 52). Claimant estimated that he could not lift more than two to three pounds, noting that he dropped things "left and right" without warning, including water glasses slipping right out of his hands. (*Id*.). He could only stand for 30 to 60 seconds, walk for 60 to 90 seconds before becoming dizzy, stand for three to five minutes, and sit for five minutes before his left arm started "kicking." (Tr. at 53-54). Claimant noted that he had to use the wall or other objects to steady himself, and he avoided stairs entirely. (Tr. at 54). In terms of treatment, Claimant testified that he continued to take Corgard and Dr. Barebo was completing additional testing. (Tr. at 50-51). According to Claimant, the presence of white matter in his MRI was a "red flag" of Parkinson's Disease of which he had a strong family history. (Tr. at 51).

## VI.  **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is

based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

**VII.** <u>**Discussion**</u>

Claimant argues that the ALJ failed to properly develop the evidence of his impairments and assess his RFC, which resulted in an inadequate hypothetical to the VE

and unsupported decision.

### A. Duty to Develop the Evidence

An "ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ "cannot rely only on the evidence submitted by the claimant when that evidence is inadequate," and that duty is heightened when a claimant is unrepresented by counsel. *Id.*; *see also Mink v. Apfel*, 215 F.3d 1320 (4th Cir. 2000). However, an ALJ's obligation to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Perry v. Astrue*, No. 3:10-CV-01248, 2011 WL 5006505, at *16 (S.D.W. Va. Oct. 20, 2011) (quoting *Mayes v. Massanari,* 276 F.3d 453, 459–60 (9th Cir. 2001)); *Fuller v. Saul*, No. 3:19-CV-00174, 2020 WL 597596, at *5 (S.D.W. Va. Jan. 13, 2020), *report and recommendation adopted,* 2020 WL 597425 (S.D.W. Va. Feb. 6, 2020); *Savage v. Saul*, No. 3:20-CV-00482, 2021 WL 2168909, at *8 (S.D.W. Va. May 7, 2021), *report and recommendation adopted,* 2021 WL 2169514 (S.D.W. Va. May 27, 2021); *Lewanda Terriel S. v. Saul*, No. CV TMD 19-1146, 2020 WL 2794588, at *4 (D. Md. May 29, 2020).

The ALJ's task is to ensure that the record contains sufficient evidence upon which the ALJ can make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *Weise v. Astrue,* No. 1:08-cv-00271, 2009 WL 3248086 (S.D.W. Va. Sept. 30, 2009); *Jones v. Saul*, No. 1:19-cv-275-GCM, 2020 WL 2411635, at *3 (W.D.N.C. May 12, 2020). Consequently, when examining the record to determine if it was adequate to support a reasoned administrative decision, the Court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to

Claimant. *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980).

Ultimately, the claimant must establish a prima facie entitlement to benefits, and he or she consequently bears the risk of nonpersuasion. *Bell v. Chater*, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (citing *Seacrist v. Weinberger,* 538 F.2d 1054, 1057 (4th Cir. 1976) and 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require.")). Despite the ALJ's responsibility to assist a claimant in developing the record, the evidentiary burden never shifts to the Commissioner. The ALJ is not required to act as a claimant's counsel and can presume that the claimant's counsel presented the strongest case for benefits when the claimant is represented. *Bell v*, 1995 WL 347142, at *4; *Perry*, 2011 WL 5006505, at *15. The ALJ's duty to develop the record does not permit a claimant, through counsel, to rest on the record and later fault the ALJ for not performing a more exhaustive investigation. *Perry*, 2011 WL 5006505, at *15 (citations and markings omitted).

This particular case in somewhat unique because Claimant was unrepresented through the date of the ALJ's decision, but he obtained counsel when his case was before the Appeals Council. Claimant primarily alleged that he was disabled due to neurological symptoms, and he advised the ALJ during his administrative hearing that the record did not include his most recent neurology records from Dr. Barebo, and he was also scheduled for an upcoming MRI. (Tr. at 39-41). The ALJ held the record open for 21 days and confirmed both at the beginning and end of the hearing that the SSA would request those records pursuant to Claimant's medical authorization. (Tr. at 40-41, 71-72).

Despite those representations, the ALJ never attempted to collect any additional medical records. The SSA received a copy of the November 2021 MRI pursuant to

Claimant's own records request to SMMC. (Tr. at 353, 373). However, it did not solicit or receive any additional information from Dr. Barebo. The last records request that the SSA sent to HIMG, Dr. Barebo's employer, was on October 6, 2021. (Tr. at 346). In response, HIMG sent a copy of Claimant's September 9, 2021 clinical visit and his September 30, 2021 brain MRI showing mild nonspecific white matter disease. (Tr. at 351). That evidence was made part of the record during the hearing. (Tr. at 41).

After the ALJ denied Claimant's disability applications, Claimant quickly filed a *pro se* request for review by the Appeals Council on January 21, 2022 on the basis that the ALJ did not consider his most recent medical records. (Tr. at 194). He specified that the medical evidence that the ALJ reviewed did not include his most recent MRI, bloodwork, and clinician notes, although he signed a release for the SSA to obtain those records. (*Id.*). Claimant alleged that his symptoms continued to worsen to the point that he was using a quad cane to ambulate. (*Id.*). He was still following up with his neurologist, and his updated diagnoses included demyelinating disease, antiphospholipid syndrome, and a possible movement disorder. (*Id.*).

A few days later, on January 25, 2022, Claimant obtained counsel. (Tr. at 10). His counsel filed a brief on his behalf with the Appeals Council which is very similar to the brief filed in this matter. (Tr. at 279-305). By counsel, Claimant generally asserted that the ALJ's decision was based on a "scant file" which did not include all of Claimant's medical evidence. (Tr. at 283). Claimant noted that, although he advised the ALJ of the deficient medical evidence, the SSA did nothing to develop the evidence. (*Id.*). Yet, despite those claims, Claimant did not identify a single piece of specific evidence that was missing from the record, nor did he include any additional evidence for the Appeals Council's review. In this action, Claimant is likewise represented by counsel and does not identify

in his brief any specific evidence that the ALJ failed to obtain, or attach any evidence for the Court's consideration. If additional records exist, Claimant has not made any showing that these records provide new or material information that might change the ALJ's findings.

Moreover, despite the ALJ's failure to solicit any further evidence, Claimant fails to show any evidentiary gaps that resulted in "unfairness or clear prejudice" to him. *Marsh,* 632 F.2d at 300. Claimant alleged that he became disabled on December 31, 2017, and the ALJ's decision was issued on December 23, 2021. The record contained, *inter alia*, Claimant's function reports; primary care records from November 2017 through December 2019; neurology records from February 2020 through September 2021; brain MRIs in September and November 2021; nerve conduction testing; and additional imaging and diagnostic tests. Further, the ALJ reviewed opinion evidence from medical experts concerning Claimant's physical and mental functional abilities; a mental consultative examination ordered by the SSA; and significant hearing testimony from Claimant describing his symptoms, limitations, daily activities, work history, and other aspects of his impairments; Claimant's wife discussing some of the same matters; and a vocational expert. The ALJ additionally requested mental health records from Prestera Center, but there were not any records to produce. (Tr. at 369, 368).

As discussed, when a claimant alleges that his case should be remanded because the ALJ failed to develop a full and fair record of his impairments, the pertinent inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision as to those impairments. *Craft v. Apfel*, No. 97-2551, 1998 WL 702296, at *3 (4th Cir. Oct. 6, 1998) (unpublished table decision). The record in this case was sufficient for the ALJ to analyze Claimant's physical and mental limitations, and there is no apparent

18

ambiguous evidence or evidentiary gaps that required the ALJ to solicit further evidence. Claimant's only complaint is that the record was "scant" and "incomplete," numbering 67 pages of medical records, some of which were duplicates. (ECF No. 8 at 6). Yet, Claimant does not identify any significant evidence that is supposedly missing from the record. Although Claimant advised during his administrative hearing that there were additional records from Dr. Barebo, he did not mention those supposed missing records to the Appeals Council or in the present case. *See, e.g., Craft*, 1998 WL 702296, at *3 (noting that even on appeal, the claimant made no showing that any further evidence would have aided her application.). Furthermore, Claimant does not articulate in any meaningful way how  he was prejudiced by the ALJ's failure to consider additional records from Dr. Barebo or any other evidence. There is no indication from Claimant that any further evidence would have reasonably affected the ALJ's decision.

For those reasons, the undersigned **FINDS** that the ALJ had sufficient medical evidence to make an informed decision about Claimant's impairments, and Claimant fails to show that this matter should be remanded for the ALJ to further develop the evidence.

### B. RFC Finding

Claimant additionally asserts that the ALJ applied the incorrect regulatory framework in assessing his RFC. (ECF No. 8 at 7). He argues that, instead of performing a function-by-function analysis, the ALJ began with the RFC conclusion and committed the same error that the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") found to be erroneous in *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 388 (4th Cir. 2021). According to Claimant, the flawed RFC finding formed the basis for an inadequate hypothetical to the VE and infected the rest of the decision.

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR §§ 404.1545(b)-(d), 416.945(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges

and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In *Dowling*, the Fourth Circuit found than an ALJ erroneously expressed the claimant's RFC in terms of exertional level of work without first engaging in a function-by-function analysis. *Id.* The Court reiterated its prior holding that a "proper RFC analysis proceeds in the following order: '(1) evidence, (2) logical explanation, and (3) conclusion.'" *Id.* (quoting *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019)). In *Dowling*, the ALJ erroneously began with the third step, a conclusion at the outset of the RFC evaluation that the claimant only "had the residual functional capacity to perform sedentary work." *Id.* "Only then did the ALJ identify evidence and attempt to explain how that evidence logically supported his predetermined conclusion." *Id.* The Fourth Circuit found that the inadequate reverse analysis justified remand, which was consistent with its prior ruling in *Thomas. Id.*

Claimant contends that the similarities between his case and *Dowling* "are striking." (ECF No. 8 at 7). Specifically, he claims that the ALJ in his case "started at a conclusion based on scant evidence which left the Administration unable to appropriately consider [his] actual limitations." *Id*. Claimant asserts that "[b]y framing the RFC in this manner, [Claimant's] actual documented limitations were neither considered nor explained and, as such, defy any meaningful review." (*Id*. at 7-8). The undersigned disagrees with these contentions for the following reasons.

Here, the ALJ did not begin the analysis with a predetermined conclusion. Rather, the ALJ methodically considered the evidence of Claimant's impairments, including Claimant's subjective allegations, his wife's testimony, and the medical and opinion evidence. He developed an RFC finding based on the functional limitations that he assessed from those impairments. Concerning tremors, the ALJ considered Claimant's complaints of increased difficulty holding things and that he was in the process of being evaluated for Parkinson's Disease. (Tr. at 24). The ALJ noted that Claimant reported some upper extremity tremors to his primary care provider, PA-C Lester, in November 2017, but there were no tremors on examination at that time. (*Id*.). After a couple of years, Claimant followed up with PA-C Lester, reporting increased tremors, and he had diffuse upper extremity tremors on examination in November and December 2019. (*Id*.). Nonetheless, Claimant retained full range of motion and intact gross and fine motor movements, and his grip strength was 4/5. (*Id*.).

The ALJ noted that PA-C Lester referred Claimant to Dr. Barebo for further neurological examination and treatment. (*Id*.). Dr. Barebo diagnosed Claimant with essential tremors and prescribed Corgard in February 2020, and the medication helped significantly through October 2020 to the extent that examination findings were normal

22

with the exception of a very mild tremor in Claimant's left upper extremity and  Claimant could now use his left hand without difficulty. (Tr. at 25). However, in September 2021, Claimant reported worsening symptoms, and Dr. Barebo found increased left upper extremity tremors with mild dysmetria, mild postural instability, and mild giveaway weakness. (*Id*.). MRIs in September and November 2021 showed mild white matter abnormalities. (*Id*.). The lesions were suggestive of demyelinating disease, but there was no change and no evidence of active demyelination. (Tr. at 25, 26). The ALJ noted that despite worsening tremors, Claimant's treatment was conservative and unchanged. (Tr. at 26). His claim that he could not hold items was not supported by objective evidence. (*Id*.). Also, he could perform many of his activities of daily living, including housework and yardwork, albeit with adjustments to account for his physical difficulties. (*Id*.).

The ALJ further considered the opinion evidence, including the findings of the state agency physicians who assessed that Claimant did not have any severe physical impairments. (*Id*.). The ALJ found that those opinions were not persuasive, noting Claimant's recently worsening tremors in his left hand that caused him to stop driving and mild white matter disease shown in two brain MRIs. (*Id*.). The ALJ also noted Claimant's recent physician certification form completed by Dr. Rostocki for medical marijuana based on a diagnosis of Parkinson's Disease, but the ALJ remarked that Dr. Rostocki did not provide any examination findings and no other provider made that diagnosis. (Tr. at 27). Ultimately, based on the evidence, the ALJ assessed that Claimant's essential tremors limited him to light exertional work; occasional postural activities with the exception of never climbing ladders, ropes, or scaffolds; occasional handling/fingering with the left upper extremity and frequent handling/fingering with the right upper extremity; and frequent feeling with the bilateral upper extremities. (Tr.

23

at 23, 25, 27).

Concerning mental impairments, the ALJ considered that Claimant had a history of depression and anxiety; reported impaired concentration when he was having a "bad day" physically, as well as lower frustration tolerance; and he claimed not to "really go anywhere." (Tr. at 25). The ALJ noted that most of Claimant's consultative examination findings in January 2020 were normal, but Claimant showed some impaired social functioning. (*Id.*). He was not taking any psychiatric medications or receiving any mental health treatment. (*Id.*). The ALJ considered the opinion evidence concerning Claimant's mental impairments, noting that the state agency psychologists' opinions were well supported by and consistent with evidence in the record. (Tr. at 26-27). In light of the evidence and giving Claimant's subjective allegations the greatest benefit of the doubt, the ALJ found that Claimant's anxiety and depression limited him to work that involved no production-rate pace, occasional and gradually introduced work changes, occasional decision-making, no responsibility for the safety of others, and occasional contact with others. (Tr. at 25-26).

As shown above, the ALJ applied the correct regulatory framework in assessing Claimant's RFC. He considered the relevant functional abilities; explained his evaluation of the evidence and conclusions; and he resolved conflicting evidence, such as Claimant's ability to hold items. His analysis of all of the evidence informed his RFC finding, contrary to the erroneous decision in *Dowling*. Furthermore, the ALJ's RFC assessment is supported by more than a scintilla of evidence in the record. There is clear objective evidence of upper extremity tremors and other symptoms justifying the exertional, postural, and manipulative limitations. While the ALJ found that Claimant's subjective allegations were not fully supported by the record, he determined RFC restrictions based

on the alleged symptoms and limitations that he found were consistent with the other evidence in the file. The ALJ also assessed fairly restrictive mental RFC limitations based, in large part, on Claimant's subjective claims. For those reasons, the undersigned **FINDS** that the RFC assessment is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 8); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 9); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th

Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: February 17, 2023

Cheryl A. Eifert
United States Magistrate Judge

26